# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT NASHVILLE
## Assigned on Briefs December 11, 2013

## STATE OF TENNESSEE v. TIMOTHY DAVALE MARTIN

**Appeal from the Criminal Court for Davidson County**
**No. 2011B1816     J. Randall Wyatt, Jr., Judge**

---

**No. M2013-00569-CCA-R3-CD - Filed March 20, 2014**

---

A Davidson County jury convicted the Defendant-Appellant, Timothy Davale Martin, of attempted especially aggravated robbery, attempted second degree murder, attempted aggravated robbery, and aggravated assault. The trial court sentenced him as a Range I, standard offender to an effective sentence of thirteen years in confinement. On appeal, the Defendant argues that: (1) the evidence is insufficient to sustain his convictions; (2) the trial court committed plain error in failing to merge the convictions for attempted aggravated robbery and aggravated assault; and (3) the trial court erred in imposing a sentence of confinement. Upon review, we conclude that the evidence is sufficient to support the convictions. However, the Defendant's dual convictions for attempted aggravated robbery and aggravated assault violate double jeopardy protections. Accordingly, we vacate his aggravated assault conviction in count four and remand the matter to the trial court for entry of an amended judgment reflecting the merger of the Defendant's aggravated assault conviction into his attempted aggravated robbery conviction in count two. The judgments of the trial court are affirmed in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part; Vacated in Part; and Remanded for Entry of Amended Judgment**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JERRY L. SMITH and ALAN E. GLENN, JJ., joined.

Dawn Deaner, District Public Defender; Jeffrey A. DeVasher, Assistant Public Defender (on appeal); and Kristin Stangl and Martesha L. Johnson, Assistant Public Defenders (at trial), Nashville, Tennessee, for the Defendant-Appellant, Timothy Davale Martin.

Robert E. Cooper, Jr., Attorney General and Reporter; Tracy L. Bradshaw, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Amy Hunter, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

This case concerns a shooting incident that occurred in the early morning hours of April 10, 2011, in a parking lot near a popular nightclub in Nashville, Tennessee. Based on this event, the Davidson County Grand Jury indicted the Defendant-Appellant, Timothy Davale Martin, for the offenses listed in the below chart.[1]

| COUNT | OFFENSE | VICTIM |
|-------|---------|--------|
| ONE | attempted especially aggravated robbery by the use of a deadly weapon and causing serious bodily injury | Jonathan Oye |
| TWO | attempted aggravated robbery by the use of a deadly weapon | Demario Watkins |
| THREE | attempted first degree premeditated murder | Jonathan Oye |
| FOUR | aggravated assault by the use of a deadly weapon | Demario Watkins |

The following proof was adduced at trial.[2]

**Trial.** Jonathan Oye, a college student and the named victim in counts one and three, testified that on the night of April 9, 2011, he went to a nightclub in Nashville with two friends, Gus Quay and Demario Watkins. Oye drove his friends in his red Ford Mustang and parked two streets from the club because there was no closer parking. Oye said he and Quay remained at the club from around 10:00 p.m. to 2:30 or 3:00 a.m. of the following day. He was uncertain whether Watkins went in the club, but all three friends left at the same time. Oye said he did not drink or have any problems with anyone while inside the club.

---

[1] Co-defendant Jeremiah Dewayne Haynes was also indicted with the Defendant in the attempted robbery charges in counts one and two. The Defendant was tried separately from Haynes, who testified as a witness for the State.

[2] The trial took place from September 17 to 19, 2012.

After exiting the club, Quay stopped to speak to some women. Oye and Watkins continued to Oye's car and a man, later determined to be the Defendant, approached the passenger side of the car. Oye testified that as the Defendant approached, he asked whether Oye and Watkins had any drugs or wanted to buy drugs. After they responded "no," Oye said the Defendant "instantly pulled out a gun" and said, "'Give me everything y'all have in there.'" The Defendant then immediately shot at, and shattered, the passenger window. Oye was in the driver's seat with the door open and Watkins was in the passenger seat of the car. Watkins jumped from the passenger seat to the back seat, and Oye jumped out of the car and attempted to crawl under it. He said that the Defendant came over to the driver's side after shooting the passenger window and told Oye to "'Give me everything you have in your pockets.'" Oye, lying face-down on the ground, did not have anything in his pockets. The Defendant proceeded to search Oye's pockets and then shot Oye in his leg. At trial, Oye showed the jury an inch-long scar on the back of his right leg from where he was shot.[3]

Oye said he "kind of blacked out" until Watkins picked him up and placed him in the back seat of the car. He then recalled Watkins driving past Quay, who was still talking to the women, and screaming to Quay that Oye had been shot, and that they were going to the hospital. At the hospital, it was determined that Oye had a broken femur, which required surgery to have a rod placed in his right leg above the knee. Oye remained at the hospital for a week due to his injury. After his release from the hospital, Oye had a bandage on his leg for two weeks and had to walk on crutches for about a month.

Oye testified that, while at the hospital, Detective Joshua Combs showed him some photographs, but he was unable to identify his assailant. Oye then identified photographs of his red Ford Mustang, which were entered into evidence. The photographs depicted the car from various angles on the night of the incident, the passenger side with a missing window, a bullet hole in the passenger side door, and Oye's shoes that were left at the scene.

On cross-examination, Oye recalled testifying at a prior court proceeding that a total of four shots were fired. He agreed that the first two shots were fired while the Defendant was on the passenger side of the vehicle, near Watkins, and that the latter two shots were fired at Oye, after the Defendant had walked to the driver's side and had physically searched Oye's pockets. Oye testified that neither he nor Watkins fired any shots that night. He agreed that the source of the gunshots were from the Defendant, and not from anyone else around the Mustang. Oye acknowledged that he was arrested on a material witness warrant the week before trial, after being taken into custody. He agreed that the trial was initially set for August 27, 2012, but stated that he did not have time to testify. He also agreed that prior

---

[3] Oye also had a two-inch scar on the side of his right thigh, received from surgery performed at the hospital, which he did not display to the jury.

to failing to appear at the initial trial date, he had asked the prosecutor, "What's in it for me if [I] showed up to testify at this trial?" He acknowledged that the material arrest warrant was still in effect. On redirect examination, Oye agreed that he lived and worked in Chattanooga and that he was concerned about missing work and school. He also agreed that it would be difficult to complete his studies if he were to lose his job.

Demario Watkins, the named victim in counts two and four, testified that he, Oye, and Gus Quay knew one another from high school. His testimony at trial was consistent, in large part, with the testimony of Oye. In addition, Watkins said he remained outside of the club and denied drinking or having trouble with anyone that night. According to Watkins, when his friends left the club, there "was a lot of chaos going on" in the area due to "two little extra shootings before." Because people were running from the shootings, Watkins and his friends waited for the area to clear out before walking to Oye's car.

Watkins further testified that he and Oye had been sitting in the car for about five minutes waiting on Quay when the Defendant approached them. Oye was in the driver's seat and Watkins was on the passenger side with the door open. Watkins testified that the Defendant approached him and asked if he had any marijuana. After he said "no," the Defendant returned and repeated the question. Watkins once again responded "no." He stated that the Defendant "turned around like he was walking away at first" and "then he turned around with a gun." He said the Defendant pointed the gun only a few inches from his face and said, "'Come off everything.'" Watkins interpreted the phrase to mean "give me what you got in your pockets, or whatever, trying to steal." At that moment, he did not have anything to give the Defendant. Watkins said his door was open with the window rolled up at this time and that the Defendant was on the inside of the door. He believed that he was about to be shot so he followed his first instinct and kicked the Defendant. Watkins then shut the passenger door and jumped into the back seat. He heard two shots fired at him, with the first shot fired as soon as he shut the car door. Watkins said he was scared of the Defendant and that he did not agree to give him anything.

At trial, Watkins identified the Defendant as the person who pulled a gun on him and asked him for marijuana. He testified that he was "100 percent" certain that the Defendant was the person who fired shots at him on the night in question. He said there was light in the parking lot from a few street lamps and that there was light from the car because the Defendant approached him while the door was open. After being shot at, Watkins looked out the backseat window of the Mustang and saw the Defendant standing over Oye with a gun. Watkins observed the Defendant point the gun to Oye's face and "[Oye] was on his back, hands up." Watkins said he was certain that the gun was pointed to Oye's face "[b]ecause [Watkins] was looking right at him[.]" He heard the Defendant also say to Oye, "'Come off everything.'" Watkins understood this to mean that the Defendant was about to

rob his friend. He testified that the Defendant fired the first shot after Oye said he did not have anything. Watkins ducked and then heard a second shot "as if [the Defendant] was shooting as he was running." Next, he heard "the screeching of tires" and observed that the Defendant had a driver.

After the Defendant left, Watkins got out of the car. He saw the police and directed them to where the Defendant had gone. He then proceeded to drive Oye to the hospital. Watkins picked Oye up, placed him in the back seat, and drove to the hospital. The police met with Watkins at the hospital and took him to a police station. Upon arrival, Watkins identified the Defendant and was "100 percent" confident on that night and at trial that the Defendant was the shooter.

Watkins agreed that the trial was initially scheduled at an earlier date and that he did not appear to testify. He acknowledged that Detective Combs, the detective in the instant case, had to bring him into custody to serve as a State witness. He testified that he did not appear at first because "[he] was just scared," though he said "[he] wasn't getting threatened." Watkins then identified photographs from the scene of the shooting. The images depicted broken glass from the car door, blood splatter on the ground, and Oye's shoes. The photographs were entered into evidence without objection.

On cross-examination, Watkins testified consistently, in large part, with the testimony of Oye. He said that the Defendant fired a total of four shots, with a pause between the two pairs of shots. Watkins stated that neither he nor Oye fired any shots that night. He also acknowledged that he was taken into custody on a material witness warrant and that the warrant was still in effect. On redirect examination, Watkins described the gun that was pointed at him as a chrome revolver. He identified a photograph of a similar gun. The photograph was admitted into evidence.

Officer Travis Baxter of the Metropolitan Nashville Police Department (MNPD), Central Precinct, testified that he was working as a patrol officer on the night of April 9, 2011, and into the early morning of April 10, 2011. He and other officers were in the area of the offense because there was a large crowd at the club, and because there had been shots fired nearby in an unrelated incident. At approximately 2:40 a.m., Officer Baxter was parked in his patrol car when he heard a gunshot from the area of 9th Avenue and Gleaves Street. About two seconds later, Officer Baxter heard three more shots in quick succession. Immediately after he heard the first gunshot, he drove up 9th Avenue where he saw a car swerving back and forth and driving toward him on the wrong side of the road. He continued to drive toward another vehicle parked at the corner of 9th and Gleaves where he spoke with a man, later identified at trial to be Watkins. Watkins confirmed that there had been a shooting and directed Officer Baxter to the swerving car, which was the only car that had left

the area. Watkins did not inform Officer Baxter that Oye had been shot. The entire encounter lasted about six seconds.

Officer Baxter saw the suspect car drive southbound on 8th Avenue "at a high rate of speed" so he initiated his blue lights and pursued the car while calling for backup to the scene at 9th Avenue and Gleaves Street. The car continued at a high speed and eventually pulled over into a small lot at Wedgewood Avenue and Martin Street. Officer Baxter and two other officers who arrived at the scene then took the driver, Jeremiah Haynes, and the Defendant into custody. The police searched the suspect car but did not find a weapon. Officer Baxter later learned that a weapon was recovered along the suspect car's route of travel. He identified photographs of the suspect car, a black Pontiac Grand Prix, and of the scene where the suspects were apprehended. The photographs were entered into evidence.

Officer Matthew Evans of the MNPD testified that at around 2:40 a.m. on the morning of the offense, he responded to Officer Baxter's call for backup in following a car that had left the scene of a suspected shooting at a high rate of speed. When he arrived at Wedgewood Avenue and Martin, he saw Officer Baxter and Officer Harrison Haynes with their weapons drawn and directing the occupants to step out of their car. At around the same time, the officers learned that there was a shooting victim arriving at the hospital. Officer Evans confirmed that the Defendant was the passenger in the apprehended car and that Watkins had made a positive identification of the Defendant as the shooter. He said that a gunshot residue test was conducted on both Jeremiah Haynes and the Defendant to determine if there was gun residue on their hands. To his knowledge, no gun residue test was conducted on either Oye or Watkins. Officer Evans did not investigate the scene of the shooting at 9th Avenue and Gleaves Street.

MNPD Sergeant John Bourque testified that he responded to Officer Baxter's call for assistance with the stop at Wedgewood and Martin. He investigated the suspect vehicle's route of travel and was able to locate a .38 Special Taurus Revolver on a sidewalk. He identified the recovered weapon for the jury. Sergeant Bourque also identified photographs depicting the revolver on the sidewalk where it was found. A close-up photograph of the casings inside the cylinder showed that four of the six rounds were fired. The weapon and the photographs were entered into evidence without objection. On cross-examination, Sergeant Bourque said that the identification unit would have processed the weapon. He testified that if the unit had reported three spent casings rather than four, then it is possible that one of the bullets could have misfired.

Officer Harrison Haynes, a MNPD patrol officer, testified that he was in his car and stationed at 8th Avenue South and Gleaves Street on the night in question. He responded to Officer Baxter's call for assistance and drove down 8th Avenue South onto Wedgewood

Avenue. He did not investigate the scene of the suspected shooting at 9th and Gleaves. After assisting in the takedown of the driver and the passenger in the suspect car, Officer Haynes went to the hospital to speak to the gunshot victim and the witness. He collected their information and checked on the gunshot injury. He was the only officer who went to the hospital. Officer Haynes observed the red Ford Mustang parked at the hospital though he did not search the car. He then brought Watkins to the Central Precinct to identify the shooter. Officer Haynes said that Watkins provided a positive identification of the suspect. To his knowledge, Watkins was not interviewed at the station and no gunshot residue test was performed. After the identification, Officer Haynes transported Watkins back to the hospital.

Jeremiah Dewayne Haynes, the co-defendant in the attempted robbery charges in counts one and two, testified that he went to middle school with the Defendant. He said his case was pending and that he did not make any pre-arranged agreement with the State in exchange for his testimony. He agreed that the prosecutor reduced his bond and that he was no longer in custody. Haynes stated that in the early morning hours of April 10, 2011, he was in the area of the club as it was closing. He drove to the scene because some "females caught [his] attention." Haynes said the Defendant "flagged [him] down," but he ignored him to talk to a girl. Less than three minutes later, Haynes heard shots. He did not see the shooter "because [he] was too busy trying to get away like everybody else." As he was leaving in his car, Haynes heard the Defendant call his name and ask for a ride to south Nashville. He agreed to give the Defendant a ride because he was going in the same direction. As they were leaving the scene, Haynes could see police and he asked the Defendant if he knew what had happened with the shooting. He said that the Defendant appeared to be "on some type of drug" and that he responded, "'I had to handle my wax.'" Haynes interpreted this phrase to mean that the Defendant "took care of some business or something." Then the Defendant told Haynes to "'just drive.'" Haynes said that he was never speeding and that the police pulled him over on Wedgewood because he did not have a driver's license. He never saw a gun in the Defendant's hand or a gun being thrown out of the car. Haynes testified that while they were being booked at the police station, the Defendant said "[h]e got ganged." He never mentioned to the police that the Defendant said he had to "handle his wax."

Detective Joshua Combs of the MNPD testified that he was assigned to investigate the instant case. He was first involved when he provided guidance for the identification of the suspects. On the night in question, Detective Combs went to the hospital and collected a bullet that was recovered from the victim's leg, which he took to the property room of the police station. At trial, he identified the bullet for the jury. Detective Combs also identified three .38 special PMT cartridges from the Taurus revolver recovered at Wedgewood, and partial spent bullet fragments recovered from the scene of the shooting. He brought these

items and the Taurus revolver to the Tennessee Bureau of Investigation (TBI) Crime Laboratory for fingerprint testing. Detective Combs said the results were inconclusive.

Detective Combs testified that he interviewed Haynes at the police station on April 10, 2011. He said that Haynes's story was continuously changing and that Haynes provided multiple versions of what transpired. At no point did Haynes inform Detective Combs that the Defendant had said, "I had to handle my wax." Detective Combs agreed that the recovered weapon had three spent bullet casings and three live rounds in its chambers. He said that when Haynes and the Defendant were left alone in the interview room, Haynes was recorded stating something to the effect of "'I didn't tell them about the gun.'" He stated that he was primarily focused on interviewing the Defendant and Haynes and that he did not extensively question Oye or Watkins. To his knowledge, the police did not search Watkins or the red Mustang that night. Detective Combs believed Watkins and Oye to be victims, and not suspects, in this case. He said that neither Haynes nor the Defendant made a claim that they were the victims of a crime.

Special Agent Steve Scott of the TBI Firearms Identification Unit testified as an expert witness for the State. He said that in the instant case, he received a fired bullet removed from a medical facility, a second fired bullet that was from the crime scene, a revolver, and a number of fired cartridge cases and unfired cartridges. After examining the revolver, Agent Scott determined that the weapon functioned normally. Based on the submitted evidence, he concluded that the two recovered bullets had been fired from the same revolver. Agent Scott also determined that three of the six rounds in the revolver had been fired and that one round had misfired. He said that a misfire would not make the same sound as a fired shot.

Based on the above proof, the jury convicted the Defendant of attempted especially aggravated robbery (count one/Oye), attempted aggravated robbery (count two/Watkins), the lesser included offense of attempted second degree murder (count three/Oye), and aggravated assault (count four/Watkins).

**Sentencing Hearing.** At the October 30, 2012 sentencing hearing, the State offered the presentence report into evidence and the defense called two witnesses.

Typhane Johnson testified that she met the Defendant when he was thirteen or fourteen years old. At the time, he lived downstairs with his foster father in the same apartment complex. Johnson said she treated the Defendant like one of her own children and that he began to live with her when he was seventeen years old. She stated that the Defendant did not know his biological father and that his mother was addicted to drugs.

According to Johnson, the Defendant had many siblings and had lived in various foster homes since birth.

Johnson described the Defendant as a good, respectful child who was conscientious about attending school and finding employment. She said he took care of his maternal grandmother before she passed away the year before. The Defendant would help clean his grandmother's home, give her medicine, cook for her, and run errands. Johnson did not know where the Defendant was living when he was arrested for the instant offenses. She said she had moved with the Defendant and her children to Columbia, Tennessee, where they enrolled in Spring Hill High School. Subsequently, her older son and the Defendant dropped out due to "racial issues" with the school principal. After leaving school, they tried to find jobs and pursued their GED. Johnson said the Defendant continued to look for work until his grandmother became ill and he returned to Nashville to care for her. She asked the trial court for leniency in sentencing the Defendant because the person described at trial was not the person she knew. Johnson said she has never known the Defendant to use drugs or to be in trouble while he lived with her. On cross-examination, Johnson agreed that the Defendant had a juvenile record. She was not aware that he had been adjudicated delinquent for taking contraband into a penal facility or that he had been placed on misdemeanor probation for evading arrest.

The Defendant testified that when he was young, his grandmother had custody of him and his nine siblings. He said he was taken into state custody at age eight, when his grandmother had a stroke. The Defendant then lived in two foster homes before moving into his sister's apartment at age eleven. While living with his sister, he met Johnson, whom he considered to be the only mother figure in his life. He said he did not have a relationship with his biological mother and that he often sees her "in the streets." Since being in custody, his sister has visited him. He considered Johnson and her children to be his family.

The Defendant said he did not obtain his GED because he returned to Nashville to help his grandmother, who had a stroke and Alzheimer's. He took care of his grandmother for a few months before she passed away in November 2010.

The Defendant stated that he had been in custody for the past seventeen or eighteen months and that jail was "really hard" for him. He said it was his first time in confinement and that he had previously completed six months of probation for evading arrest. On the night of his arrest in the instant case, the Defendant said he was at the club with some friends, including his co-defendant, Haynes. He testified that Haynes's little brother was in a fight with Watkins and his friends. The Defendant helped Hayne's brother in the altercation and was kicked out of the club. He said he was ready to go home but his cousin, who had driven him, wanted to go to an after hours club. The Defendant then retrieved his belongings,

including a gun, from his cousin's car and planned to get a ride home from Haynes. According to the Defendant, when he went around the building, he saw "three dudes standing there" near a red Mustang, including the two victims and a man with dreads. He said one man ran off and one man fired a gun, so he "returned three shots" and then went to Haynes's car. They were then pulled over by the police while traveling down 8th Avenue. The Defendant did not know if he had actually hit anyone with his shots. He did not tell the police that he had been fired at first because "[he] was nervous and scared." He was twenty years old at the time and had not been questioned by the police before. The Defendant apologized for his actions and said "[he] could have handled the situation a little better." He said he acted in self-defense, and denied ever attempting to commit a robbery. On cross-examination, the Defendant agreed that he was on misdemeanor probation when he was arrested in the instant case. He also acknowledged that, as a juvenile, he was adjudicated delinquent for taking contraband into a penal facility.

After taking the matter under advisement, the trial court sentenced the Defendant as a Range I, standard offender to nine years for the attempted especially aggravated robbery of Oye; four years for the attempted aggravated robbery of Watkins; nine years for the attempted second degree murder of Oye; and four years for the aggravated assault of Watkins. The court divided the convictions into two groups by victim and imposed concurrent sentencing within the groups and ordered the sentences related to Oye and Watkins to be served consecutively to one another for a total effective sentence of thirteen years in the Department of Correction. The trial court found this sentence to be the minimum necessary to protect society and the least severe measure necessary to appropriately punish the Defendant.

After the trial court denied the Defendant's motion for a new trial, this appeal followed.

## ANALYSIS

**I. Sufficiency of the Evidence.** The Defendant argues that the evidence is insufficient to support his convictions. Specifically, he contends that the evidence does not support a finding that he attempted to rob the victims, that the State failed to establish that Oye suffered "serious bodily injury," and that the State failed to prove that he attempted a knowing killing of Oye. The State argues that there was sufficient evidence for a jury to find beyond a reasonable doubt that the Defendant committed these offenses. We agree with the State.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958

S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. <u>State v. Matthews</u>, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing <u>State v. Brown</u>, 551 S.W.2d 329, 331 (Tenn. 1977); <u>Farmer v. State</u>, 343 S.W.2d 895, 897 (Tenn. 1961)).

The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. <u>State v. Odom</u>, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." <u>Henley v. State</u>, 960 S.W.2d 572, 578-79 (Tenn. 1997). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." <u>Bland</u>, 958 S.W.2d at 659. A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." <u>Id.</u> (citing <u>State v. Tuggle</u>, 639 S.W.2d 913, 914 (Tenn. 1982)).

"In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." <u>State v. Dorantes</u>, 331 S.W.3d 370, 379 (Tenn. 2011) (citing <u>Duchac v. State</u>, 505 S.W.2d 237, 241 (Tenn. 1973); <u>Marable v. State</u>, 313 S.W.2d 451, 456-58 (Tenn. 1958)). However, "[t]he jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" <u>State v. Rice</u>, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting <u>Marable</u>, 313 S.W.2d at 457). This court may not substitute its inferences for those drawn by the trier of fact in cases involving circumstantial evidence. <u>State v. Sisk</u>, 343 S.W.3d 60, 65 (Tenn. 2011) (citing <u>State v. Lewter</u>, 313 S.W.3d 745, 748 (Tenn. 2010)). We note that the standard of review "'is the same whether the conviction is based upon direct or circumstantial evidence.'" <u>State v. Hanson</u>, 279 S.W.3d 265, 275 (quoting <u>State v. Sutton</u>, 166 S.W.3d 686, 689 (Tenn. 2005)); <u>State v. Carruthers</u>, 35 S.W.3d 516, 557 (Tenn. 2000). The court in <u>Dorantes</u> specifically adopted the standard for circumstantial evidence established by the United States Supreme Court in <u>Holland</u>:

"Circumstantial evidence . . . is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more."

Dorantes, 331 S.W.3d at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)).

The Defendant was convicted of attempted especially aggravated robbery, attempted aggravated robbery, attempted second degree murder, and aggravated assault. Robbery "is the intentional or knowing theft of property from the person or another by violence or putting the person in fear." T.C.A. § 39-13-401(a). Especially aggravated robbery is a robbery that is "[a]ccomplished with a deadly weapon" and "[w]here the victim suffers serious bodily injury." Id. § 39-13-403(a). Aggravated robbery, as relevant in this case, does not require a finding of serious bodily injury. "Serious bodily injury" means bodily injury that involves a substantial risk of death, protracted unconsciousness, extreme physical pain, protracted or obvious disfigurement, or protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty. Id. § 39-11-106(a)(34). Second degree murder is the knowing killing of another. Id. § 39-13-210(a)(1). A person acts "knowingly" when the person is aware of either the nature of the conduct or that the conduct is reasonably certain to cause a result. See id. § 39-11-302(b). As charged in the indictment, a person commits aggravated assault when he or she "[u]ses or displays a deadly weapon" and "[i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury." Id. §§ 39-13-101, -102 (2010).

The offense of criminal attempt is defined as follows:

A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Id. § 39-12-101(a).

**A.  Attempted Robbery.**  In challenging the sufficiency of the evidence to sustain the convictions for the attempted robberies of Oye and Watkins, the Defendant essentially attacks the credibility of the witnesses.  To support this claim, he  asserts that a rational trier of fact cannot accredit the victims' testimony that they went to a popular nightclub without any property in their pockets.  He also maintains that the physical evidence of three shots fired from the revolver is irreconcilable with the testimony of Oye and Watkins that the Defendant fired four shots.  The Defendant also points to the fact that Watkins did not notify the police that Oye was wounded and that both Oye and Watkins had to be taken into custody on material witness warrants.  Accordingly, the Defendant argues that the evidence at trial does not establish beyond a reasonable doubt that he attempted to rob Oye or Watkins.

Viewed in the light most favorable to the State, the evidence presented at trial was sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the Defendant committed the offenses of attempted especially aggravated robbery and attempted aggravated robbery.  Here, the jury considered the evidence and resolved all apparent inconsistencies in favor of the prosecution's theory, finding that the Defendant did in fact attempt to rob Oye and Watkins on April 10, 2011.  Although the Defendant argues that the circumstances of the incident call into question the credibility of Oye and Watkins, it is the prerogative of the jury to weigh and evaluate the evidence.  Moreover, a guilty verdict reconciles all conflicts in the evidence in favor of the State's theory.  See Bland, 958 S.W.2d at 659; see also Carruthers, 35 S.W.3d 516, 557-58.  This court does not resolve questions of witness credibility and factual issues, nor do we re-weigh or re-evaluate the evidence.  See State v. Evans, 108 S.W.3d 231, 236 (Tenn. 2003) (citing Bland, 958 S.W.2d at 659).  We also decline to substitute our inferences for those drawn by the trier of fact.  See State v. Ross, 49 S.W.3d 833, 845 (Tenn. 2001) (citing State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998)).  Accordingly, we conclude that the evidence was sufficient to sustain the Defendant's convictions in counts one and two.

**B.  Serious Bodily Injury.**  The Defendant also argues the evidence is insufficient to sustain his conviction for attempted especially aggravated robbery because the State failed to establish that Oye suffered serious bodily injury.  Instead, he contends that his conviction in count one should be modified to attempted aggravated robbery.  The Defendant, citing

-13-

State v. Farmer, 380 S.W.3d 96 (Tenn. 2012), asserts that the State did not establish that Oye's injuries involved a substantial risk of death, protracted loss of consciousness, extreme physical pain, protracted or obvious disfigurement, or protracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty. See T.C.A. § 39-11-106(a)(34). Although Oye displayed an inch-long scar to the jury, the Defendant argues that the term "disfigurement" is included in the statutory definition of "bodily injury." See id. § 39-11-106(a)(2).

In Farmer, the Tennessee Supreme Court held that evidence of a gunshot wound was insufficient to establish "extreme physical pain" and to constitute "serious bodily injury" where the bullet passed through the victim's leg and hospital records classified the pain as "mild" to "moderate." Farmer, 380 S.W.3d at 101. No evidence was presented showing that the victim sustained permanent scars from being shot or that he suffered protracted impairment of his leg. Id. at 102. Interestingly, the victim in Farmer testified that he did not realize he had been shot until he noticed a hole in his pants. Id. at 101. In contrast to the victim in Farmer, Oye displayed to the jury an inch long scar on the back of his leg from where the bullet struck. He subsequently learned at the hospital that the bullet had penetrated his femur, and he underwent surgery to have a metal rod inserted above his knee to treat the broken bone. Oye also testified that he had a two-inch scar on his right thigh from the surgical incision. He was hospitalized for one week and had to use crutches for about a month.

Here, there was sufficient evidence from which a rational jury could have found that Oye suffered serious bodily injury involving protracted or obvious disfigurement based on his scars. Protracted, as relevant here, means "delayed or prolonged in time." State v. Derek Denton, No. 02C01-9409-CR-00186, 1996 WL 432338, at *5 (Tenn. Crim. App. Aug. 2, 1996) (citing Merriam Webster's Collegiate Dictionary 939 (10th ed. 1994); American Heritage Dictionary 568 (1975)) (determining the meaning of protracted unconsciousness as a basis for serious bodily injury). The record shows that the incident causing the victim's injuries occurred on April 10, 2011. At the trial on September 19, 2012, a year and a half after the shooting, Oye displayed the scar from his gunshot wound. This court has consistently held that a scar is sufficient to support the element of serious bodily injury. See State v. James Richardson Reece, No. M2011-01556-CCA-R3-CD, 2013 WL 1089097, at *14 (Tenn. Crim. App. Mar. 14, 2013) (citing cases in which this court held that a scar constitutes protracted or obvious disfigurement for the purpose of establishing serious bodily injury), perm. app. denied (Tenn. June 17, 2013); State v. Deonte Matthews, No. M2010-00647-CCA-R3-CD, 2012 WL 5378046, at *4 (Tenn. Crim. App. Oct. 31, 2012) (same); State v. Richard Dale Capps, No. M2010-02143-CCA-R3-CD, 2012 WL 3800848, at *7 (Tenn. Crim. App. Sept.4, 2012) (holding that the victim's scar from a two-inch laceration on his ear was sufficient to establish serious bodily injury), perm. app. denied (Tenn. Feb.

13, 2013); State v. Anthony D. Forster, No. M2002-0008-CCA-R3-CD, 2011 WL 1431980, at *10 (Tenn. Crim. App. April 12, 2011) (concluding that the victim's scar, which began in the middle of the bridge of her nose and ended at her lip, was sufficient to establish the element of serious bodily injury), perm. app. denied (Tenn. Aug. 24, 2011); State v. Clay B. Sullivan, No. M2004–03068–CCA–R3–CD, 2006 WL 644021, at *8 (Tenn. Crim. App., Mar. 10, 2006) (concluding that two-inch scar from a gunshot wound to the shoulder was sufficient for a jury to find protracted and obvious disfigurement). Therefore, we conclude that there is sufficient evidence to support a finding of serious bodily injury based on Oye's protracted or obvious disfigurement.

**C. Attempted Second Degree Murder.** In challenging the sufficiency of the evidence to sustain count three, the Defendant contends that the State failed to establish beyond a reasonable doubt that he intended to commit a knowing killing of Oye. He argues that the evidence, at best, supports a conviction for reckless endangerment with a deadly weapon under Tennessee Code Annotated section 39-13-103.

Attempted second degree murder requires the State to prove that a defendant acted with the intent to knowingly kill another and took a substantial step toward doing so. Second degree murder is a result-of-conduct offense because the statute "'focuses purely on the result and punishes an actor who knowingly causes another's death.'" State v. Brown, 311 S.W.3d 422, 431-32 (Tenn. 2010) (quoting State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000)). As instructed to the jury in the instant case, "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." See also T.C.A. § 39-11-302(b). A defendant's mental state is a factual question for the jury to resolve. Brown, 311 S.W.3d at 432 (citing State v. Inlow, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000)). The Tennessee Supreme Court has explained that circumstantial evidence is often the only means of proving mental state: "[W]hile a defendant's mental state is rarely subject to proof by direct evidence, it is within the authority of the jury to infer the defendant's intent, and, therefore, whether the defendant acted 'knowingly,' from surrounding facts and circumstances." Brown, 311 S.W.3d at 432 (citations and quotations omitted).

Viewed in the light most favorable to the State, the evidence is sufficient to support a conviction of attempted second degree murder. The proof established that the Defendant approached Oye and Watkins in an attempt to rob them. After shots were fired at the passenger's side of the Ford Mustang, Oye attempted to hide underneath his car on the driver's side. The Defendant searched Oye's pockets and when he could not find anything he shot Oye at close range. The Defendant was indicted for attempted first degree murder and based on the evidence at trial, the jury convicted him of the lesser included offense of

attempted second degree murder. Based on the evidence presented at trial, a reasonable juror could find that the Defendant was guilty of attempted second degree murder of Oye.

**D. Aggravated Assault.** In challenging the sufficiency of the evidence to support his conviction in count four, the Defendant contends that Watkins could not have had a reasonable fear of imminent bodily injury where his response to a gun pointed at him was to kick his assailant. Viewed in the light most favorable to the State, the evidence was sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the Defendant used a deadly weapon and intentionally or knowingly caused Watkins to reasonably fear imminent bodily injury. Watkins testified that he was scared of the Defendant and his first instinct was to kick the Defendant and to close the car door. After the Defendant fired shots at the passenger door, Watkins said he jumped into the backseat to distance himself from the Defendant. He also stated that he ducked when he heard additional shots fired. The evidence presented at trial was sufficient for the jury to infer that Watkins reasonably feared imminent bodily injury from the Defendant's use of a deadly weapon.

Based on the evidence presented at trial, a rational trier of fact could have found beyond a reasonable doubt that the Defendant committed the offenses of attempted especially aggravated robbery, attempted aggravated robbery, attempted second degree murder, and aggravated assault. The jury was responsible for weighing and evaluating the evidence and to make reasonable inferences based on the proof. We conclude that the evidence was sufficient to sustain the Defendant's convictions. Accordingly, he is not entitled to relief on this issue.

**II. Double Jeopardy.** The Defendant argues that his separate convictions for attempted aggravated robbery with a deadly weapon and aggravated assault with a deadly weapon violate double jeopardy.[4] He asserts that the trial court committed plain error in

---

[4] Although the Defendant did not raise this issue in his motion for new trial, we may address his claim on its merits. Tennessee Rule of Appellate Procedure 3(e) provides, in pertinent part:

> [I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.

Tenn. R. App. P. 3(e) (emphasis added). By its explicit terms, Rule 3(e) operates as a waiver of only those issues in which a new trial is the remedy for the error. A new trial is not the remedy for a double jeopardy error; instead, a reversal of the conviction and a dismissal of the relevant charge or a merger of the two

(continued...)

failing to merge his convictions in counts two and four. In response, the State contends that the Defendant has failed to establish that the trial court committed plain error. The State also asserts that these two convictions did not arise from the same act or transaction. Notwithstanding the sufficiency of the convicting evidence as detailed above, we conclude that the Defendant's dual convictions for attempted aggravated robbery and aggravated assault violate double jeopardy protections.

The Double Jeopardy Clause of the United States Constitution and article I, section 10 of the Tennessee Constitution prohibit placing a individual in jeopardy twice for the same offense. U.S. Const. amend. V; Tenn. Const. art I, § 10. Three fundamental protections are encompassed in the principle of double jeopardy: "(1) protection against a second prosecution after an acquittal; (2) protection against a second prosecution after conviction; and (3) protection against multiple punishments for the same offense." State v. Thompson, 285 S.W.3d 840, 847 (Tenn. 2009) (citations and internal quotation marks omitted). In this case, we are concerned with the third category of double jeopardy protection.

"Whether multiple convictions violate double jeopardy is a mixed question of law and fact, which we review de novo without any presumption of correctness." State v. Watkins, 362 S.W.3d 530, 539 (Tenn. 2012) (citing Thompson, 285 S.W.3d at 846). The focus of the analysis of whether a defendant may receive multiple punishments in a single prosecution is legislative intent. Id. at 542. We presume that the legislature does not intend to permit cumulative punishment that violates double jeopardy. Id. at 557. Moreover, multiple convictions that violate double jeopardy constitute "plain error." See Tenn. R. App. P. 36(b) (stating that "[w]hen necessary to do substantial justice, [this] court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal"); State v. Jonathan Armstrong, No. 02C01-9312-CC-00271, 1994 WL 718465, at *3 (Tenn. Crim. App. Dec. 30, 1994) (concluding, as plain error, that the appellant's multiple convictions for aggravated assault and attempted aggravated robbery against the same victim violate principles of double jeopardy), perm. app. denied (Tenn. Apr. 10, 1995).

"Multiplicity concerns the division of conduct into discrete offenses, creating several offenses out of a single offense." State v. Phillips, 924 S.W.2d 662, 665 (Tenn. 1996) (footnote omitted). Although Phillips was a sex-offense case, the principles in that case have

---

(...continued)

counts that violate double jeopardy are the proper remedies. See State v. Addison, 973 S.W.2d 260, 267 (Tenn. Crim. App. 1997) (concluding that both dismissal of the charge and merger of the same offense counts into one judgment of conviction are appropriate remedies when the convictions violate a defendant's right against double jeopardy).

been adjusted and applied to other types of criminal offenses. State v. Epps, 989 S.W.2d 742, 745 (Tenn. Crim. App. 1998). This court, when examining an issue regarding multiplicity, is guided by the following principles:

1. A single offense may not be divided into separate parts; generally, a single wrongful act may not furnish the basis for more than one criminal prosecution;

2. If each offense charged requires proof of a fact not required in proving the other, the offenses are not multiplicitous; and

3. Where time and location separate and distinguish the commission of the offenses, the offenses cannot be said to have arisen out of a single wrongful act.

Id. at 745 (quoting Phillips, 924 S.W.2d at 665). Other considerations regarding multiplicity are "the nature of the act; the time elapsed between the alleged conduct; the intent of the accused, i.e., was a new intent formed; and cumulative punishment . . . ." Id.

Here, the Defendant was indicted, tried, and convicted in a single prosecution for the attempted aggravated robbery and aggravated assault of Demario Watkins arising from an incident that occurred in a parking lot at approximately 2:40 a.m. on April 10, 2011. As charged in the indictment, essential elements of both offenses included the use of a deadly weapon and the victim's fear. In considering the Defendant's claim that his multiple convictions under different statutes punish the "same offense," we apply the Blockburger standard. See Watkins, 362 S.W.3d at 556; see also Blockburger v. United States, 284 U.S. 299 (1932). Pursuant to the Blockburger test, the threshold inquiry is whether the defendant's convictions arose from the same act or transaction. Watkins, 362 S.W.3d at 545. If the offenses did not arise from the same act or transaction, then double jeopardy protections are not implicated, and the inquiry ends. Id.

In response to the Defendant's claim for double jeopardy protection, the State maintains that the convictions in counts two and four did not arise from the same act or transaction. To support this assertion, the State argues that the Defendant was convicted of attempted aggravated robbery when he pointed a gun at Watkins, demanding "Come off everything," and placing Watkins in fear at that particular moment. The State further asserts that the conviction for aggravated assault was based on the fact that the Defendant fired two shots at Watkins, who was inside the vehicle, and caused him to reasonably fear imminent bodily injury. However, we are not persuaded with such particularity in the division of the Defendant's conduct. The record does not reflect that the factual basis for the offense charged in count four was specifically limited to when the Defendant fired two shots at

-18-

Watkins, and not to when the Defendant pointed a gun at Watkins. The charged offenses in counts two and four occurred at the same time, at the same place, involved the same victim and the same gun. Therefore, we find double jeopardy protections to be implicated in this case. See, e.g., Watkins, 362 S.W.3d at 558 ("Here, there was only one victim, and Defendant was charged with committing both offenses on August 30, 2004, without reference to any specific or discrete acts. Thus, the threshold is surpassed, meaning the potential for a double jeopardy violation exists in this case.") (footnote omitted).

Under the Blockburger test, we next consider the statutory elements of the offenses of aggravated robbery and aggravated assault. See Watkins, 362 S.W.3d at 557. "If the elements of the offenses are the same, or one offense is a lesser included of the other, then we will presume that multiple convictions are not intended by the General Assembly and that multiple convictions violate double jeopardy." Id. In comparing the relevant statutes, we should determine "whether each provision requires proof of an additional fact that the other does not." Blockburger, 284 U.S. at 304. As we noted earlier in this opinion, attempted aggravated robbery by use of a deadly weapon requires proof that the defendant intentionally or knowingly attempted to take property from the victim. See T.C.A. §§ 39-13-401(a), -402(a); § 39-12-101. Every robbery requires proof that the defendant used violence or placed the victim in fear. Id. § 39-13-401(a). Aggravated assault by use of a deadly weapon requires proof that the defendant intentionally or knowingly caused the victim to reasonably fear imminent bodily injury. See id. §§ 39-13-101, -102. Aggravated robbery does not necessarily involve the fear of bodily harm, because the "violence" element may suffice, and aggravated assault does not necessarily require the taking of property. Therefore, pursuant to Blockburger, aggravated robbery is not the "same offense" as aggravated assault for double jeopardy purposes. However, our analysis does not end here.

In determining whether a defendant in a single prosecution may receive multiple punishments, we must also consider whether one offense is a lesser included offense of the other. Watkins, 362 S.W.3d at 557; see also Brown v. Ohio, 432 U.S. 161, 169 (1977) (holding that the Double Jeopardy Clause bars cumulative punishment for greater and lesser included offenses). "An offense is a lesser included offense if . . . [a]ll of its statutory elements are included within the statutory elements of the offense charged[.]" T.C.A. § 40-18-110 (f)(1). Therefore, although the statutory elements of two offenses may not be the same, the elements of one offense may nevertheless be included in the other. Here, count two of the charging instrument alleged that the Defendant "did intentionally or knowingly attempt to obtain from the person of Demario Watkins, by violence or putting Demario Watkins in fear, certain property, to wit: money of value, by use of a deadly weapon[.]" The essential elements of "violence" or "fear" are not statutorily defined. However, the Tennessee Supreme Court has previously held that "the plain meaning of the element of violence as used in the offense of robbery pursuant to Tenn. Code Ann. § 39-13-401 is

-19-

evidence of physical force unlawfully exercised so as to damage, injure or abuse." State v. Fitz, 19 S.W.3d 213, 217 (Tenn. 2000). "'The fear constituting an element of [robbery] is fear of present personal peril from violence offered or impending.'" State v. Bowles, 52 S.W.3d 69, 80 (Tenn. 2001) (quoting Britt v. State, 26 Tenn. (7 Hum.) 45 (1846)). Count four charged that the Defendant "intentionally or knowingly did cause Demario Watkins to reasonably fear imminent bodily injury, and [the Defendant] did use or display a deadly weapon, to wit: a handgun[.]"

In this context, we conclude that the aggravated assault conviction in count four is the "same offense" as the attempted aggravated robbery in count two. Here, the statutory elements of aggravated assault are necessarily included within the elements of attempted aggravated robbery as charged. Both convictions are based on the Defendant's use of a deadly weapon, against the same victim, and causing that victim to experience fear of personal harm.[5] See Jonathan Armstrong, No. 02C01-9312-CC-00271, 1994 WL 718465, at *4 (finding aggravated assault by use of a deadly weapon to be a lesser included offense of attempted aggravated robbery by use of a deadly weapon), perm. app. denied (Tenn. Apr. 10, 1995); State v. Jason C. Carter, No. M1998-00798-CCA-R3-CD, 2000 WL 515930, at *8 (Tenn. Crim. App. Apr. 27, 2000) (concluding that aggravated assault was a lesser included offense of especially aggravated robbery as charged), perm. app. denied (Tenn. Nov. 20, 2000); State v. Marcus Johnson, No. W2002-00987-CCA-R3-CD, 2003 WL 22080778, at *11 (Tenn. Crim. App. Sept. 4, 2003) (same), perm. app. denied (Tenn. Jan. 26, 2004). Here, it was plain error for the Defendant to be convicted of attempted aggravated robbery by use of a deadly weapon and aggravated assault by use of a deadly weapon arising from the same facts and circumstances. Accordingly, we conclude that the Defendant's dual convictions violate principles of double jeopardy, and he is entitled to relief on this issue. We vacate the Defendant's aggravated assault conviction in count four and remand the matter

---

[5] Indeed, this court has previously merged aggravated assault convictions with the underlying robbery, even where the victim was injured. See State v. Felton Neville Jackson, No. M2012-00828-CCA-R3CD, 2013 WL 5675466 (Tenn. Crim. App. Oct. 17, 2013) (merging aggravated assault by use of a deadly weapon into especially aggravated robbery conviction where the victim was beaten in the head with a club and robbed in his motel room); Jonathan Armstrong, No. 02C01-9312-CC-00271, 1994 WL 718465, at *4 (concluding that the defendant's offenses arose from one criminal episode because the aggravated assaults "were necessarily involved in the offense of attempt to commit aggravated robbery, and that the facts necessary to convict the appellant of criminal attempt to commit aggravated robbery would have convicted him of either count of aggravated assault" where the armed defendant approached the victim in his car and demanded money, and the victim was shot in the foot by a co-defendant); State v. Miko T. Burl, No. W2000–02074–CCA–R3–CD, 2002 WL 1483207, at *2 (Tenn. Crim. App. Jan. 28, 2002) (vacating the defendant's conviction for aggravated assault where the physical acts supporting "use of a deadly weapon" for especially aggravated robbery were the same physical acts establishing "use of a deadly weapon" for the aggravated assault, and concluding that the offenses arose from "a single wrongful act").

to the trial court for entry of an amended judgment reflecting the merger of the Defendant's aggravated assault conviction into his attempted aggravated robbery conviction in count two.

      **III. Sentencing.** The Defendant argues that the trial court erred in imposing sentences of continuous confinement. Specifically, he contends that the considerations under Tennessee Code Annotated section 40-35-103(1) do not justify a sentence of confinement in his case. The Defendant maintains that he does not have a long history of criminal conduct; that the State did not present evidence to show that a sentence of confinement would deter others in the jurisdiction from committing similar criminal acts; and that the record does not establish that he has previously been the subject of failed rehabilitative measures. The Defendant therefore asserts that he should have been granted supervised probation on all counts. In response, the State does not explicitly address the Defendant's specific claims. The State contends that the trial court properly denied the Defendant alternative sentencing and imposed a sentence consistent with the purposes and principles of the Sentencing Act. Upon review, we conclude that the trial court did not abuse its discretion in denying an alternative sentence in this case.

      We review the length and manner of service of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). Furthermore, the misapplication of enhancement or mitigating factors does not invalidate the imposed sentence "unless the trial court wholly departed from the 1989 Act, as amended in 2005." Id. at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." Id. This standard of review also applies to "questions related to probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012).

      Pursuant to the 2005 amendments to the Sentencing Act, a trial court must consider the following when determining a defendant's specific sentence and the appropriate combination of sentencing alternatives:

    (1) The evidence, if any, received at the trial and the sentencing hearing;
    (2) The presentence report;
    (3) The principles of sentencing and arguments as to sentencing alternatives;
    (4) The nature and characteristics of the criminal conduct involved;
    (5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
    (6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Id. § 40-35-210(b). The defendant has the burden of showing the impropriety of the sentence on appeal. Id. § 40-35-401(d), Sentencing Comm'n Cmts.

In determining whether to deny alternative sentencing and impose a sentence of total confinement, the trial court must consider if:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Id. § 40-35-103(1)(A)-(C); see State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

We note that the trial court's determination of whether the defendant is entitled to an alternative sentence and whether the defendant is a suitable candidate for full probation are different inquiries with different burdens of proof. State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). The defendant has the burden of establishing suitability for full probation, even if the defendant is considered a favorable candidate for alternative sentencing. Id. (citing T.C.A. § 40-35-303(b)).

The Defendant, as a Range I offender, was sentenced to four years for each Class C felony and nine years for his Class B felonies. He received sentences of one year above the minimum in each range. See T.C.A. § 40-35-112(a)(2), (3). The Defendant was eligible for probation because each sentence was ten years or less and because the offenses were not specifically excluded by statute. See T.C.A. § 40-35-303(a); State v. Langston, 708 S.W.2d 830, 832-33 (Tenn. 1986) (concluding that a defendant is eligible for probation if each of the sentences is ten years or less regardless of the effective sentence). However, an eligible defendant "is not automatically entitled to probation as a matter of law." T.C.A. § 40-35-303(b), Sentencing Comm'n Cmts. Although the trial court shall automatically consider probation as a sentencing alternative for eligible defendants, the defendant bears the burden of proving his or her suitability for probation. T.C.A. § 40-35-303(b). The defendant must demonstrate that probation would serve "the ends of justice and the best interests of both the

-22-

public and the defendant." State v. Souder, 105 S.W.3d 602, 607 (Tenn. Crim. App. 2002) (citations omitted).

Here, the trial court properly concluded that an alternative sentence was "not appropriate in this case." In imposing a sentence of incarceration, the court found that confinement was necessary to avoid depreciating the seriousness of the offense and to provide an effective deterrence to others. See T.C.A. § 40-35-103(1)(B) (2010). The court also found that measures less restrictive than confinement had recently been applied unsuccessfully to the Defendant because he had been serving six months of misdemeanor probation when he was arrested in the instant case. See id. § 40-35-103(1)(C). The trial court determined the effective sentence of thirteen years' imprisonment to be the minimum necessary to protect society and the least severe measure necessary to appropriately punish the Defendant for the offenses committed.

Although the Defendant correctly asserts that the State is required to submit evidence to establish the need for general deterrence, the Tennessee Supreme Court held in State v. Hooper, 29 S.W.3d 1 (Tenn. 2000):

> Because the "science" of deterrence is imprecise at best, the trial courts should be given considerable latitude in determining whether a need for deterrence exists and whether incarceration appropriately addresses that need. Accordingly, we will presume that a trial court's decision to incarcerate a defendant based on a need for deterrence is correct so long as any reasonable person looking at the entire record could conclude that (1) a need to deter similar crimes is present in the particular community, jurisdiction, or in the state as a whole, and (2) incarceration of the defendant may rationally serve as a deterrent to others similarly situated and likely to commit similar crimes.

Hooper, 29 S.W.3d at 10. Here, the record reflected that there had already been unrelated shootings in the area of a popular and crowded nightclub. The offenses for which the Defendant stands convicted reflect intentional or knowing conduct, motivated by a desire to gain from the criminal activity. The evidence shows that the Defendant discharged a revolver at least three times in an attempt to steal property. There is ample evidence in the record for a reasonable person to conclude that there was a need for deterrence and that the Defendant's incarceration would rationally serve as a deterrent. See generally, id. at 10-12. Furthermore, the trial court did not base its decision solely on the need for deterrence. The court also determined that confinement was necessary to avoid depreciating the seriousness of the offense. See T.C.A. § 40-35-103(1)(B). Although the Defendant contends that he has not previously been the subject of failed rehabilitative measures, the record reflects that he

was on probation at the time he committed the instant offenses, which calls into question his potential for rehabilitation.  See id. § 40-35-103(1)(C).

Because the record shows that the trial court carefully considered the evidence, the enhancement and mitigating factors, and the purposes and principles of sentencing prior to imposing a sentence of confinement, the Defendant has failed "to either establish an abuse of discretion or otherwise overcome the presumption of reasonableness afforded" to the trial court's sentence in this case.  Caudle, 388 S.W.3d at 280.  Accordingly, we uphold the Defendant's effective thirteen year sentence in the Tennessee Department of Correction.

## CONCLUSION

We conclude that the evidence is sufficient to support the convictions.  However, the Defendant's dual convictions for attempted aggravated robbery and aggravated assault violate double jeopardy protections.  We vacate his aggravated assault conviction in count four and remand the matter to the trial court for entry of an amended judgment in count two reflecting the merger of the Defendant's aggravated assault conviction into his attempted aggravated robbery conviction.  The trial court's judgments are affirmed in all other respects.

_____
CAMILLE R. McMULLEN, JUDGE